# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: February 12, 2026

```
* * * * * * * * * * * * * * *
LESLIE ARMSTRONG,                     *
                                      *
              Petitioner,             *    No. 20-1221V
                                      *
v.                                    *    Special Master Young
                                      *
SECRETARY OF HEALTH                   *
AND HUMAN SERVICES,                   *
                                      *
              Respondent.             *
* * * * * * * * * * * * * * *
```

*Laura Levenberg*, Muller Brazil LLP, Dresher, PA, for Petitioner.
*Mary Eileen Holmes*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On September 17, 2020, Leslie Armstrong ("Petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program ("the Program")[2] alleging that the influenza ("flu") vaccine Petitioner received on September 22, 2017, resulted in the development of acute disseminated encephalomyelitis ("ADEM").[3] Pet. at 1, ECF No. 1.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] ADEM is "an acute or subacute encephalomyelitis or myelitis characterized by perivascular lymphocyte and mononuclear cell infiltration and demyelination." *Acute Disseminated Encephalomyelitis*, DORLAND'S ONLINE MED. DICTIONARY, https://www.dorlandsonline.com/dorland/definition?id=73033 (hereinafter, "DORLAND'S"); Encephalomyelitis is "inflammation involving both the brain and the spinal cord." *Encephalomyelitis*, DORLAND'S.

A careful analysis and weighing of all the evidence and testimony presented in this case in accordance with the applicable legal standards[4] reveals that Petitioner has failed to provide preponderant evidence that the flu vaccine she received on September 22, 2017, was the cause-in-fact of her ADEM. Accordingly, Petitioner is not entitled to an award of compensation.

## I.    Procedural History

On September 17, 2020, Petitioner filed her petition. Pet. She also filed her flu vaccine consent form, personal affidavit, and medical records. Pet'r's Exs. 1–8, ECF No. 1. Petitioner filed her statement of completion on October 13, 2020. ECF No. 8. Respondent filed his Rule 4(c) Report on October 14, 2021. Resp't's Rept., ECF No. 20. Petitioner filed additional medical records on December 14, 2021. Pet'r's Ex. 9, ECF No. 21. On August 19, 2022, Petitioner filed an expert report from Maria Fangchun Chen, M.D., Ph.D., Dr. Chen's curriculum vitae ("CV"), and supporting literature. Pet'r's Exs. 10–27, ECF No. 25. Respondent filed a responsive report from S. Mark Tompkins, Ph.D., on March 2, 2023, with his CV and supporting medical literature. Resp't's Ex. A–B, Resp't's Ex. A, Tabs 1–6, ECF No. 29. An additional expert report and CV from Karen Roos, M.D., was filed by Respondent on April 17, 2023, with supporting literature filed on June 21, 2023. Resp't's Exs. C–D, ECF No. 30; Resp't's Ex. C, Tabs 1–2, ECF No. 31. On October 20, 2023, Petitioner filed a supplemental expert report from Dr. Chen with accompanying literature. Pet'r's Exs. 28–38, ECF No. 34. Supplemental expert reports for both of Respondent's experts were filed on February 23, 2024. Resp't's Exs. E–F, ECF No. 35. In response, Petitioner filed a second supplemental expert report from Dr. Chen on May 30, 2024, along with reference materials. Pet'r's Exs. 39–45, ECF No. 36; *see also* ECF No. 38.[5]

A Motion for a Ruling on the Record was filed by Petitioner on July 26, 2024, followed by Respondent's Response on September 30, 2024, and Petitioner's Reply on October 18, 2024. Pet'r's Mot., ECF No. 40; Resp't's Resp., ECF No. 42; Pet'r's Reply, ECF No. 43. This matter is now ripe for consideration.

## II.    Medical Records

Petitioner's past medical history includes hypertension, anxiety, gastroesophageal reflux disease ("GERD"), obesity, and hyperlipidemia. Pet'r's Ex. 3 at 36–45. On September 22, 2017, Petitioner presented to Dr. Karen Finnigan at Crystal Run Healthcare ("CRH") with complaints of a recurring rash for the past several months on her chest. *Id.* at 36. She was diagnosed with suspected post inflammatory skin changes and received the flu vaccine during her visit. *Id.* at 39; Pet'r's Ex. 1 at 1. Petitioner presented to Dr. Sandy Doti at CRH on September 26, 2017, with a

---

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[5] Petitioner requested to strike Exhibits 39 and 40 due to a clerical mistake and later refiled these exhibits at ECF No. 38 on May 31, 2024.

four-day history of head pain and pressure behind her eyes. Pet'r's Ex. 3 at 28–31. She also reported left temporal pain and "neck pain at night." *Id.* at 28. Petitioner was diagnosed with an acute tension-type headache, likely triggered by a neck strain, and prescribed Flexeril. *Id.* at 31.

Two days later, on September 28, 2017, Petitioner presented to the emergency room ("ER") with a headache "varying (sic) in intensity in sharpness and dullness to forehead." Pet'r's Ex. 9 at 38. She "report[ed her] headache ha[d] gotten progressively worse over the past [four] days." *Id.* A head computed tomography ("CT") scan was normal and Petitioner "report[ed] feeling much improved." *Id.* She was discharged with an unspecified headache diagnosis and told to follow up with her primary care provider ("PCP"). *Id.* A CRH telephone call log noted a September 29, 2017 call from Petitioner's spouse that detailed Petitioner's ER visit to her PCP. Pet'r's Ex. 3 at 25. Petitioner "was taken to Lenox Hill Hosp[ital] yesterday for sever[e headaches]- CT negative - got [intravenous fluids] and med[ication] - now home - has 102 temp." *Id.* at 25. Petitioner was advised to go to the ER if her temperature increased, if she became lethargic, or if she experienced mental status changes. *Id.* The next day, on September 30, 2017, Petitioner presented to the ER via ambulance for an altered mental status. Pet'r's Ex. 4 at 252–61. Her husband reported that she woke up early speaking gibberish. *Id.* at 253. Her intake examination was normal, but she was not alert or oriented. *Id.* Petitioner's primary and secondary diagnoses were altered mental status and delirium, respectively. *Id.* at 262. The urine toxicology screening was positive for THC but was otherwise normal, and an unsuccessful lumbar puncture was attempted. *Id.* at 277. There was no clear source of infection, and a repeat lumbar puncture was planned to rule out encephalitis.[6] *Id.* at 281. Dr. Marcus Calderon evaluated Petitioner and assessed her with encephalopathy.[7] *Id.* at 282. Differential diagnoses included "[d]rug reaction to THC containing compound, cerebritis/encephalopathy due to idiosyncratic reaction from flu shot, viral encephalitis, bacterial encephalitis/meningitis,[8] or unknown/autoimmune cerebritis,[9] or Lyme encephalitis." *Id.*

On October 1, 2017, Petitioner underwent magnetic resonance imaging ("MRI") of her brain. Pet'r's Ex. 4 at 314. The impression was "multiple bilateral punctate and linear acute/subacute infarctions[10] suspicious for an embolic etiology." *Id.* Petitioner was also evaluated by neurologist Sami Saba. *Id.* at 307–09. On examination, she was able to follow some simple commands and answer some questions, but she was not oriented to place or time. *Id.* at 307. Her reflexes were diffusely hyperreflexic with clonus in both ankles. *Id.* The overall clinical picture was consistent with viral encephalitis, which was supported by the MRI findings. *Id.* at 308. During a full neurologic examination on October 2, 2017, Petitioner was alert, awake, oriented to person and place, and able to respond to simple commands. *Id.* at 311. However, she still had difficulty with language and comprehension of complex tasks. *Id.* Dr. Nazish Ilyas' attestation noted that Petitioner's MRI results were "suggestive of an inflammatory/infectious process;" however, there remained an "unclear etiology of [Petitioner]'s presentation." *Id.* at 315. A negative HSV screen and a prior history of chicken pox made viral encephalitis less likely, but Dr. Ilyas "also

---

[6] Encephalitis is "inflammation of the brain." *Encephalitis*, DORLAND'S.

[7] Encephalopathy is "any degenerative disease of the brain." *Encephalopathy*, DORLAND'S.

[8] Meningitis is "inflammation of the meninges, usually by either a bacterium . . . or a virus." *Meningitis*, DORLAND'S.

[9] Cerebritis is "inflammation of the cerebrum." *Cerebritis*, DORLAND'S.

[10] An infarct is "an area of coagulation necrosis in a tissue due to local ischemia resulting from obstruction of circulation to the area." *Infarct*, DORLAND'S.

consider[ed] an autoimmune or paraneoplastic encephalitis." *Id.* Petitioner's condition was improving with Decadron, and further testing was recommended in consideration of infectious encephalitis. *Id.*

On October 2, 2017, Petitioner had an initial physical therapy ("PT") evaluation. Pet'r's Ex. 4 at 334–38. She was able to follow single-step instructions 75% of the time. *Id.* at 335. An electroencephalogram ("EEG") performed that day showed findings indicative of a risk of focal onset seizures from bitemporal regions and associated mild to moderate diffuse cerebral dysfunction. *Id.* at 454–55. However, no seizures were recorded. *Id.* On October 3, 2017, Petitioner was evaluated by infectious disease physician Joseph Daibes. *Id.* at 376–79. He determined that Petitioner's altered mental status was unlikely to be infectious after analysis of the cerebrospinal fluid ("CSF") samples did not yield an obvious indicator. *Id.* at 379. Petitioner was instructed to continue acyclovir but discontinue antibiotics, since the source was unlikely to be bacterial. *Id.* at 369–72. A repeat brain MRI was performed, and the differential diagnoses included autoimmune encephalitis, demyelinating and/or inflammatory diseases, vasculitis/vasculopathy,[11] sarcoid,[12] viral encephalitis or granulomatous disease. *Id.* at 391, 461–62.

Dr. Saba conducted a neurological examination on October 4, 2017. Pet'r's Ex. 4 at 388–92. Petitioner was improving and had no complaints. *Id.* at 388. She was able to get out of bed and use the bathroom without assistance. *Id.* A mini mental status examination ("MMSE") revealed that Petitioner could respond to simple commands, spell words backwards, and recall two out of three words. *Id.* Dr. Saba felt that Petitioner's MRI pattern was suggestive of perivenous encephalomyelitis. *Id.* The rapid improvement in her mental status was likely due to the steroid treatment, because antiviral treatment does not usually lead to such rapid improvement in viral encephalitis. *Id.* Petitioner was to continue dexamethasone for five days, followed by a prednisone taper. *Id.* Petitioner was discharged on October 5, 2017, and advised to follow up for a repeat MRI in two weeks. *Id.* at 412–18. Her history included outdoor activity in upstate New York two weeks prior to hospitalization and her flu vaccination one week prior to hospitalization. *Id.* at 416. Petitioner's principal discharge diagnosis was encephalitis and her care plan noted that "in [her] case, it may be that [her] flu shot triggered an immune response that, by chance (1/100,000), resulted in [her] own body attack[ing] the brain." *Id.* at 414.

Petitioner's husband called her PCP on October 6, 2017, and requested that Petitioner be provided with home PT to help with balance issues. Pet'r's Ex. 3 at 20. On October 18, 2017, Petitioner returned to Dr. Saba for a follow-up visit. Pet'r's Ex. 6 at 52–59. Her pre-hospitalization and hospital course were discussed, and Dr. Saba noted that Petitioner's presentation was most consistent with ADEM. *Id.* at 57. During the visit, Petitioner was able to concentrate and comprehend. *Id.* She had normal muscle strength in all extremities and her balance was intact. *Id.* Her deep tendon reflexes ("DTRs") were 3+. *Id.*

Petitioner returned to Dr. Saba on November 1, 2017 to discuss the results of her October 25, 2017 brain MRI. Pet'r's Ex. 6 at 44–46. He advised Petitioner that the MRI showed residual FLAIR hyperintensities without enhancement or diffusion restriction. *Id.* at 44. Petitioner reported

---

[11] Vasculitis is "inflammation of a blood or lymph vessel." *Vasculitis*, DORLAND'S.

[12] Sarcoidosis is "a chronic, systemic granulomatous reticulosis of unknown etiology characterized by hard tubercles." *Sarcoidosis*, DORLAND'S.

doing better, though not 100%. *Id.* During a November 29, 2017 follow up, Petitioner reported to Dr. Saba that despite improvement, she felt like she had leg weakness after walking for a while. *Id.* at 34–37. Her examination and assessment were unchanged, but Dr. Saba made a PT referral. *Id.* at 37. On January 3, 2018, Petitioner again returned to Dr. Saba for a follow-up visit. *Id.* at 32–33. Her speech and memory were better; however, she complained of diffuse pain to touch, and her muscles and joints were tender to palpation on examination. *Id.* at 33. She was assessed with neuropathic pain, and Cymbalta was prescribed. *Id.*

On January 9, 2018, Petitioner presented for a PT evaluation. Pet'r's Ex. 5 at 15, 20–21. She was using a cane and had complaints of limited ambulation with pain. *Id.* at 20. Petitioner attended approximately 29 PT sessions from January 9 to August 14, 2018. *Id.* at 3. At discharge, she had residual deficits, including mild balance instability, but was greatly improved and had met her PT goals. *Id.*

A neuropsychological evaluation on January 24, 2018, revealed general intellectual functioning within expectations and consistent with premorbid estimates. Pet'r's Ex. 6 at 66–72. Petitioner recounted her post-hospitalization cognitive difficulties, including recalling learned behaviors like brushing her teeth. *Id.* at 66. Her attention, working memory, and processing speed were largely within normal limits. *Id.* at 69. However, her fine motor speed and dexterity were impaired bilaterally. *Id.*

In March and April 2018, Petitioner reported persistent balance issues and that music sounded different to her. Pet'r's Ex. 5 at 13; Pet'r's Ex. 6 at 27–28. She also suffered from panic attacks and was experiencing jamais vu.[13] Pet'r's Ex. 6 at 27. On November 14, 2018, Petitioner returned to Dr. Saba for follow up. *Id.* at 21–23. She was able to walk without a cane without much difficulty. *Id.* at 21. She had improved but had some paraphasic errors and difficulty remembering things. *Id.* She did not report neuropathic pain. *Id.* During a March 28, 2019 follow-up with Dr. Saba, Petitioner reported feeling almost back to normal. *Id.* at 16. *Id.* Dr. Saba noted that she had substantially improved. *Id.* On examination, she had normal concentration and comprehension. *Id.* at 17. Petitioner exhibited an "adequate knowledge of [her] personal past history," and her vocabulary was appropriate. *Id.* Physically, she had normal tone in all extremities and a normal gait. *Id.* Her DTRs were symmetric and intact. *Id.* Petitioner was doing well and advised to follow up in six months. *Id.* Petitioner has not provided any records of treatment after March 2019.

## III.    Experts

### A. Expert Qualifications

#### 1.  Petitioner's Expert, Maria Fangchun Chen, M.D., Ph.D.

Dr. Chen is a board-certified neurologist and is currently a "director of clinical development at Research and Development of Teva Pharmaceuticals." Pet'r's Ex. 10 at 1. She received her M.D. and Ph.D. from the University of Pennsylvania School of Medicine, where she

---

[13] Jamais vu is "a disorder of memory characterized by the illusion that the familiar is being encountered for the first time." *Jamais Vu*, Merriam Webster Online Dictionary, https://www.merriam-webster.com/medical/jamais%20vu.

also completed her medical internship and neurology residency. Pet'r's Ex. 11 at 1. In her prior clinical practice, she "saw over 2,000 patients . . . [and] supervised neurology resident physicians and medical students." Pet'r's Ex. 10 at 1. Throughout her lifetime, Dr. Chen has seen "[seven] cases of ADEM, with [three] of those cases occurring in the last [five] years." *Id.* Her current role oversees "clinical research at a pharmaceutical company and evaluate[s] a wide variety of neurological complications than can occur in the course of a clinical trial." *Id.* Dr. Chen has published literature regarding the mechanisms that describe how HIV injures the nervous system but has not published anything specific to ADEM. *Id.*

### 2. Respondent's Expert, S. Mark Tompkins, Ph.D.

Dr. Tompkins is a Professor of Infectious Diseases in the Center for Vaccines and Immunology at the University of Georgia and has co-authored "more than 100 peer-reviewed papers and book chapters in the fields of immunology and virology." Resp't's Ex. A at 1. He received his Ph.D. in Immunology from Emory University and completed post-doctoral fellowships in virology and immunology at both Northwestern University Medical School and the Food and Drug Administration. Resp't's Ex. B at 1. His current research "focuses on understanding the interactions of the [flu] virus and [flu] vaccines with the host." Resp't's Ex. A at 1. Dr. Tompkins teaches graduate students immunology and virology, and trains pre- and post-doctoral fellows in his laboratory. *Id.* Dr. Tompkins also serves as "an *ad hoc* reviewer for NIH study sections and scholarly journals, [has] served on the editorial board for peer-review journals, and [has] been invited to speak and/or chair organizing committees and sessions for national and international conferences." *Id.* at 1–2.

### 3. Respondent's Expert, Karen Roos, M.D.

Dr. Roos is a board-certified neurologist "with 42 years of experience in the case of patients with neurological disorders" with a specialty in neurological infectious diseases. Resp't's Ex. C at 1. She received her M.D. from Drexel University School of Medicine and completed her internship and neurology residency at the University of Virginia Medical Center. Resp't's Ex. D at 1. She is currently a Professor of Neurology at the Indiana University School of Medicine, where she teaches neurology residents and medical students in addition to caring for patients directly. Resp't's Ex. C at 1. She also has specifically received funding for research regarding "our understanding of the clinical criteria, ancillary diagnostic studies, and best therapy to improve the neurological outcome of [ADEM]." *Id.*

## B. Expert Reports

### 1. Diagnosis

Petitioner's expert, Dr. Chen, defined ADEM as "an immune mediated disorder of the central nervous system due to a demyelination that is widespread (multifocal) resulting in the clinical symptom of encephalopathy (altered consciousness or behavior) along with other neurological deficits." Pet'r's Ex. 10 at 7. She noted that the condition is more commonly seen in children and "a diagnostic criteria does not exist for adult cases." *Id.* Instead, cases of adult ADEM are identified by "the clinical presentation of an altered mental status followed with radiologic

finding of demyelination that is acute and a [CSF] finding indicating an inflammatory but non-infectious process." *Id.* MRI findings typically include "T2 hyper-intense white matter lesions that signif[y] demyelination and white matter brain injury." *Id.* 7–8. Dr. Chen continued that "[CSF] analysis should demonstrate inflammation (evidence by leukocytosis) without the isolation of infectious agents." *Id.* at 8. Although there are rare variants that relapse, "ADEM is classically monophasic with a subacute progression to a peak with spontaneous recovery." *Id.* The symptomatology varies, but "encephalopathy when present is typically exclusionary of alternative diagnosis once infection has been disproven." *Id.*

Dr. Roos, Respondent's expert neurologist, opined that "abnormalities found on the diffusion-weighted images of the brain MRI are most typical of infection or ischemia." Resp't's Ex. C at 4. She explained that vascular disease can result in ischemia and is treated with corticosteroids. *Id.* Given a clinical presentation of encephalitis during "the height of mosquito season," Dr. Roos also asserted that an arbovirus should be considered when a patient has potentially been exposed to arthropods; particularly in cases with adults, who "are significantly less likely to have this disease." *Id.* Clinical signs of ADEM, according to Dr. Roos, include "headache, encephalopathy and multifocal neurological deficits depending on the location in the brain and spinal cord where lesions develop." *Id.* at 4–5.

### 2. Causation

Dr. Chen explained how historically, the number of ADEM cases following viral infections and vaccinations led to an "observation that the pathology of these cases were similar to that seen in an experimental allergic encephalomyelitis [("EAE")] model of disease that was produced by injecting myelin to cause demyelination." Pet'r's Ex. 10 at 7. Pathogenic molecular mimicry can occur when cross reactivity that "results from the similarity of the antigenicity of the infectious agent in viruses or in vaccines to the antigenicity of myelin or neuronal auto-antigen," results in the body's production of antibodies or a cell-mediated immune response. *Id.* The immune system misidentifies the myelin of the nerves as the foreign antigen and attacks, causing injury. *Id.* Dr. Chen explained that "the [flu] vaccine has been shown in a mouse model of [central nervous system ("CNS")] demyelination to be able to induce anti-[myelin oligodendrocyte glycoprotein ("MOG")] antibodies." Pet'r's Ex. 28 at 2. She continued that "[t]he ability of the [flu] vaccine to elicit anti-MOG antibodies that are found in ADEM is evidence that given the right genetic background, anti-MOG antibodies that cause demyelination may be generated as a response to [flu] vaccination." *Id.* In support of this contention, Dr. Chen quoted the Stojkovic[14] paper; "in EAE-[flu] vaccinated mice, a mild but not significant increase of anti[-]myelin antibodies was detected, compared to EAE mice." Pet'r's Ex. 39 at 2 (citing Pet'r's Ex. 33 at 2). She characterized the level of anti-myelin antibodies as mild but asserted that their presence is "supportive of molecular mimicry of [flu] vaccine as an increase in auto-antibodies was noted with [flu] vaccination." *Id.* Dr. Chen conceded that the incidence of EAE does not increase in the mice that were vaccinated; however, she contended that "the finding that anti-MOG antibodies being elevated from [flu] vaccination demonstrates the possibility of [flu] vaccine eliciting autoimmune antibodies via molecular mimicry." *Id.*

---

[14] Aleksandra Stojkovic, *Role of Inactivated Influenza Vaccine in Regulation of Autoimmune Processes in Experimental Autoimmune Encephalomyelitis*, 124 INT'L J. NEUROSCIENCE 139 (2013).

Dr. Chen cautioned that "while molecular mimicry has been proposed as the mechanism of ADEM post vaccination . . . this cannot be definitively proven in every case as there is not a specific test to prove molecular mimicry." Pet'r's Ex. 10 at 7. Further, she argued that epidemiological studies are unreliable "given that many of these conditions are rare and can be misdiagnosed or overlooked for alternative diagnosis particularly if the cases are mild." *Id.*

Respondent's expert, Dr. Tompkins, asserted that "there is strong evidence demonstrating that there is no association between receipt of [flu] vaccines and onset of ADEM with sufficient numbers to make conclusive statements regarding a lack of association." Resp't's Ex. A 5. Specifically, Dr. Tompkins referred to the Greene et al.[15] Vaccine Datalink study that included ADEM cases within their classification of neurologic adverse events following flu vaccination. *Id.* (citing Resp't's Ex. A, Tab 2). He noted the author's description "regarding an association between [flu] vaccine and ADEM as weak," and their definition of weak as "insufficient evidence to conclude a vaccine may be causing an adverse event." *Id.* at 5. Dr. Tompkins also clarified that the evidence analyzed in the study was "entirely based upon reports of temporal associations between [flu] infection and ADEM, not vaccination." *Id.* He then discussed studies that focus on the flu vaccine. Li et al.[16] found no increased risk of ADEM following the administration of more than seven million vaccines over two flu seasons. Resp't's Ex. A, Tab 3 at 4. Baxter et al.[17] similarly found no association between ADEM and the flu vaccine in a study involving approximately 19 million doses. Resp't's Ex. A, Tab 4 at 1. Dr. Tompkins asserted "the number of vaccinations considered in these studies undermines Dr. Chen's suggestion that ADEM is too rare to be detected in vaccine safety studies." Resp't's Ex. A at 6.

Additional studies submitted by Dr. Chen to articulate the development of ADEM via vaccine-associated molecular mimicry were also critiqued by Dr. Tompkins. Resp't's Ex. A at 6. Dr. Tompkins noted that only one of these articles, Karussis & Petrou,[18] asserted 5-10% of ADEM cases may be related to a vaccination. *Id.* (citing Pet'r's Ex. 18). He also noted their disclaimer, "despite a close temporal relation to vaccinations, there is no concrete evidence of a clear pathogenetic correlation." *Id.* What the article does show, according to Dr. Tompkins, is a "possible pathogenic mechanisms of disease," and "not evidence of vaccine related molecular mimicry. *Id.*

These studies were all critiqued by Dr. Chen who asserted that "the analysis was not sufficiently powered to detect an association should the relative risk of meningoencephalitis (i.e. ADEM) be [low]." Pet'r's Ex. 28 at 2. Dr. Chen also noted the caveat by Li et al. "that if the assumed treatment effect is higher than the actual treatment effect, the study is underpowered to detect a signal and the study has falsely concluded there is no association." *Id.*

---

[15] Sharon K. Greene et al., *Near Real-Time Surveillance for Influenza Vaccine Safety: Proof-of-Concept in the Vaccine Safety Datalink Project*, 171 AM. J. EPIDEMIOLOGY 177 (2010).

[16] Rongxia Li et al., *Post Licensure Surveillance of Influenza Vaccines in the Vaccine Safety Datalink in the 2013-2014 and 2014-2015 Seasons*, 25 PHARMACOEPIDEMIOLOGY & DRUG SAFETY 928 (2016).

[17] Roger Baxter et al., *Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis*, 63 CLINICAL INFECTIOUS DISEASES 1456 (2016).

[18] Dimitrios Karussis & Panayiota Petrou, *The Spectrum of Post-Vaccination Inflammatory CNS Demyelinating Syndromes*, 13 AUTOIMMUNITY REVS. 215 (2014).

### 3. Timing

The appropriate time frame for onset of symptoms identified by Dr. Chen ranged from days to weeks, "due to the biological variability of the immune response across the human population." Pet'r's Ex. 10 at 7. More specifically, "from exposure to antigen is typically accepted to be within [two] days to [three-to-four] weeks of the precipitating event although this is not firmly established given that antigenic exposure cannot be identified in some cases." *Id.* at 8. Dr. Tompkins relied on Rowhani-Rahbar et al.[19] to articulate an appropriate onset interval of five to 28 days for ADEM following vaccination, as best supported by "available biological and epidemiological data." Resp't's Ex. A at 7 (citing Resp't's Ex. A, Tab 5). Secondarily, he noted that Baxter et al. identified two to 42 days, relying on the Vaccine Datalink. *Id.* (citing Resp't's Ex. A, Tab 4). Lastly, he noted Li et al. "utilized a risk interval of [one to] 21 days." *Id.* (citing Resp't's Ex. A, Tab 3).

### 4. Clinical Presentation

Petitioner's encephalopathy, as evidenced by her altered consciousness, was accompanied by an MRI that revealed "evidence of white matter changes consistent with ADEM." Pet'r's Ex. 10 at 9. Dr. Chen noted that in adults, ADEM is a diagnosis of exclusion, and Petitioner's "[CSF] did not show evidence of an infection to support alternative diagnosis such as bacterial or viral meningitis." *Id.* Other diagnostic evidence that Dr. Chen identified in the medical record included Petitioner's "clinical course of improvement in response to immunosuppressive therapy." *Id.* Also notable, an October 4, 2017 progress note authored by Dr. Ilyas indicated "likely [diagnosis] is autoimmune encephalitis-post flu vaccine." *Id.* (citing Pet'r's Ex. 4 at 433).

Dr. Tompkins explained that his initial report was a direct response to Dr. Chen's first expert report, specifically "addressing her conclusion that the [flu] vaccination caused [Petitioner] to develop [ADEM]." Resp't's Ex. A at 2. He clarified that arguments notwithstanding, he "do[es] not endorse or argue against the diagnosis of ADEM." *Id.* Dr. Roos opined that Petitioner's diagnosis was given "because no other etiology for her encephalitis was found." Rep't's Ex. C at 4. She continued that ADEM "appears only this one time in the medical record of her September hospitalization." *Id.* Dr. Roos called it "disingenuous to attribute a diagnosis of exclusion [] to an adverse effect of a vaccination." *Id.* at 5. She noted that Petitioner's differential diagnoses included autoimmune encephalitis, vasculitis, or arthropod-borne viral encephalitis, and that ADEM is not included. *Id.*

Dr. Chen and Dr. Roos continued to disagree about Petitioner's diagnosis in their supplemental expert reports. Pet'r's Ex. 28; Resp't's Ex. F. Dr. Chen argued that Dr. Roos did not support her differential diagnoses with "any diagnostic testing in [Petitioner's] medical records." Pet'r's Ex. 28 at 3. Dr. Chen disagreed with Dr. Roos' inclusion of West Nile encephalitis as a possible diagnosis for Petitioner because Petitioner did not exhibit flaccid paralysis with brainstem involvement that is typically seen in such cases. *Id.* Additionally, Petitioner's response to corticosteroids is not indicative of West Nile infection. *Id.* Furthermore, Dr. Chen argued that Petitioner's "CT angio[gram] did not show any evidence of vasculopathy to support a vasculitis nor to support further examination with invasive testing with a conventional angiogram." *Id.* She

---

[19] Ali Rowhani-Rahbar et al., *Biologically Plausible and Evidence-Based Risk Intervals in Immunization Safety Research*, 31 VACCINE 271 (2012).

asserted that "ADEM can also result in [the] positive [diffusion weighted imaging]" seen in Petitioner's case and described by Dr. Roos as indicative of vasculitis. *Id.* Vasculitis "typically requires a long course of corticosteroids with the additional (sic) of additional immunosuppressive therapies such as rituximab for induction therapy. Likewise . . . there was not isolation of any autoimmune antibody to support an autoimmune encephalitis." *Id.* at 3–4. Dr. Roos countered Dr. Chen's assertion that all other asserted conditions were excluded by noting that "in the case of [Petitioner], the Principal Discharge Diagnosis [was]: Altered mental status, unspecified altered mental status type." Resp't's Ex. F at 2.

Vaccine causation, according to Dr. Chen, is "supported by the medical record." Pet'r's Ex. 10 at 8. First, Petitioner had no pre-vaccination history of autoimmune disorders or "any causative respiratory or gastroenteritis." *Id.* She also did not report or exhibit symptoms "which would reflect the occurrence of common infections." *Id.* The exclusion of any identified infectious etiology lends support to Dr. Chen's asserted mechanism of molecular mimicry because the most common alternative causes for ADEM have been ruled out. *Id.* Also, other CNS demyelinating disorders such as multiple sclerosis are also not possible given the lack of additional demyelinating events. *Id.*

Dr. Chen acknowledged that Petitioner's four-day headache, which would have begun the same day as her vaccination, "may have signified the onset of ADEM;" however, she reasoned that "headaches are nonspecific and cannot be definitively attributed to ADEM." Pet'r's Ex. 10 at 8. Further, she argued that the headache did not commence until after Petitioner received her flu vaccine. *Id.* Alternatively, Dr. Chen asserted that Petitioner's encephalopathy is a more definitive symptom of ADEM. *Id.* at 8–9. Petitioner's altered consciousness manifested on September 29, 2017, seven days following her vaccination. *Id.* at 9. Dr. Chen argued that this timing is more consistent with her asserted vaccine-causation mechanism. *Id.* Conversely, Dr. Tompkins argued that "the medical records provide no support for excluding the early clinical symptoms." Resp't's Ex. A at 7. He continued that "[a]t best, the timing of onset of the first signs of ADEM in (sic) unclear and so may or may not fall within a plausible risk interval." *Id.*

## 5. Medical Literature

There were several articles filed that define ADEM and describe features and characteristics. Tenembaum et al.[20] wrote that ADEM "is an immune-mediated inflammatory disorder of the CNS characterized by a widespread demyelination that predominantly involves the white matter of the brain and spinal cord." Pet'r's Ex. 12 at 1. The authors described "[a] prodromal phase with fever, malaise, headache, nausea, and vomiting may be observed shortly before the development of meningeal signs and drowsiness." *Id.* at 2. Additionally, they stated that "[t]he clinical course is rapidly progressive and usually develops over hours to maximum deficits within days." *Id.* Pohl et al.[21] enumerated similar prodromal symptoms of fever, malaise, irritability, somnolence, headache, nausea, and vomiting that "is typically rapidly progressive, with maximal

---

[20] Silvia Tenembaum et al., *Acute Disseminated Encephalomyelitis*, 68 NEUROLOGY 23 (2007).

[21] Daniela Pohl et al., *Acute Disseminated Encephalomyelitis: Updates On An Inflammatory CNS Syndrome*, 87 NEUROLOGY 38 (2016).

deficits within [two] to [five] days." Pet'r's Ex. 13 at 3. Another article, Scolding[22] discussed ADEM following nonneural vaccines. Pet'r's Ex. 14 at 2–3. The timing described here also includes prodromal illness seen within two weeks after vaccination lasting for a few days and followed by "a wide variety of focal and/or diffuse neurologic symptoms." *Id.* at 3. The authors noted that headache and fever are common in children, "although these symptoms can also occur in adults." *Id*. Steiner & Kennedy[23] acknowledged that "[n]o limit or time range for the possible association between infection and disease has been set. Thus, the lag (incubation) period between infection, viral or bacterial, and ADEM varies from [two] to 30 days or more." Pet'r's Ex. 16 at 2.

Molecular mimicry was presented as a potential causal mechanism by Stojkovic et al. based on mice models. Pet'r's Ex. 33. The authors examined antimyelin antibody titer in the blood and the expression of MHC class I and II molecules immunohistochemistry in the brain of mice with EAE. *Id.* at 2. They began by noting that "[flu] vaccination has been linked with autoimmune diseases and reports of autoimmune adverse events related to neurological diseases." *Id.* The study involved a comparison of flu vaccinated mice, flu vaccinated mice and unvaccinated mice induced with a MOG peptide to develop EAE, and non-treated mice. *Id.* The results did not reveal any effect that flu vaccination had "on the development of clinical signs, production of autoantibodies and expression of MHC-I and II molecules in mice with EAE." *Id.* at 9. The authors concluded that "[flu] vaccine has no significant influence on EAE induction and severity of autoimmune processes." *Id.* at 2. However, the authors suggested that because the production of autoantibodies is correlated with the development of EAE clinical signs and MHC molecule expression, autoantibodies may be an appropriate "biomarker [] for investigating the effect of vaccination on EAE regulation." *Id.*

Petitioner submitted cases studies of ADEM following flu vaccinations. Maeda & Idehara[24] described a 33-year-old woman who developed ADEM following her first flu (H1N1) vaccine. Pet'r's Ex. 20 at 1. She had no immediate adverse reaction, but 15 days later, experienced ascending leg numbness. *Id.* She also had no prodromal symptoms, such as headache, nausea, or fever. *Id.* A second case, detailed by Machicado et al.,[25] involved an 83-year-old woman who presented to the ER "with [one] day of altered consciousness, weakness, and fever." Pet'r's Ex. 21 at 1. She reported a two-day history of headache behind her eyes that "then progressed to decreased verbal response and inability to follow commands along with weakness and fever on the day of admission." *Id.* Eight days prior to her hospitalization that ultimately lead to the ADEM diagnosis, she received a flu vaccine. *Id.*

Li et al. monitored for occurrence of ADEM following trivalent and quadrivalent flu vaccines administered during the 2013 and 2014-15 flu seasons. Resp't's Ex. A, Tab 3. Over the course of two flu seasons, approximately 7.2 million vaccinations yielded "no association"

---

[22] Niel Scolding, *Acute Disseminated Encephalomyelitis and Other Inflammatory Demyelinating Variants*, 122 HANDBOOK CLINICAL NEUROLOGY 601 (2014).

[23] Israel Steiner & Peter G. E. Kennedy, *Acute Disseminated Encephalomyelitis: Current Knowledge and Open Questions*, 21 J. NEUROVIROLOGY 473 (2015).

[24] Kengo Maeda & Ryo Idehara, *Acute Disseminated Encephalomyelitis Following 2009 H1N1 Influenza Vaccination*, 51 INTERNAL MED. 1931 (2012).

[25] Jorge D. Machicado et al., *Acute Disseminated Encephalomyelitis Following Seasonal Influenza Vaccination in an Elderly Patient*, 20 CLINICAL & VACCINE IMMUNOLOGY 1485 (2013).

between either variant and ADEM. *Id.* at 6. Baxter et al. analyzed the occurrence of ADEM and transverse myelitis following the administration of nearly 64 million vaccine doses. Resp't's Ex. A, Tab 4 at 4. There were 47 cases of ADEM that "were accepted both by the MRA and by the neurologist as an acute new diagnosis," and where the subject "had received an immunization within [nine] months prior to the onset." *Id.* at 5. The only statistically significant increase in occurrence followed the Tdap vaccine. *Id.* There was no increased risk corresponding with any variant of the flu vaccine. *Id.*

Rowhani-Rahbar et al. analyzed data from two studies that reviewed ADEM onset following immunization. Resp't's Ex. A, Tab 5 at 3. One of the studies analyzed, Torisu et al.[26] followed children 15 years of age and younger. *Id.* at 5. They found "[t]he mean onset of ADEM following immunization was 17 days" with a total range of nine to 30 days. *Id.* In the second study analyzed, Hynson et al.[27] also reviewed cases with child subjects aged 16 years of age and younger. *Id.* Both studies identified ADEM cases following Japanese encephalitis, rubella, hepatitis B, and live poliovirus vaccines. *Id.* However, the authors found that only the rabies vaccine "with a peak interval of [one-to-two] weeks between immunization and onset of ADEM's neurologic symptoms" had been shown to have a epidemiological and pathological association. *Id.* at 4. Assuming ADEM developed as an adverse effect following vaccination, the chain of events: "provision of an antigenic stimulus, the mounting of a subsequent immunologic response, and onset of clinical disease," would require at least 48 hours to be biologically plausible. *Id.* at 4.

## IV.    Applicable Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) that petitioner suffered an "off-Table injury," one not listed on the Table, as a result of receiving a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006). In this case, Petitioner does not allege a Table injury and must prove that her injury was caused-in-fact by a Table vaccine.

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. 42 U.S.C. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)).

---

[26] H. Torisu et al., *Clinical Study of Childhood Acute Disseminated Encephalomyelitis, Multiple Sclerosis, and Acute Transverse Myelitis in Fukuoka Prefecture, Japan,* 32 BRAIN DEVELOPMENT 454 (2010). This article was not filed as an exhibit.

[27] J.L. Hynson et al., *Clinical and Neuroradiologic Features of Acute Disseminated Encephalomyelitis in Children*, 56 NEUROLOGY 1308 (2001). This article was not filed as an exhibit.

In the seminal case of *Althen v. Sec'y of the Dept. of Health & Hum. Servs*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. 418 F.3d 1274, 1278–79 (Fed. Cir. 2005). In *Broekelschen v. Sec'y of Health and Hum. Servs.*, the Federal Circuit recognized that in some circumstances, the special master may "first determine which injury was best supported by the evidence in the record before applying the *Althen* test." 618 F.3d 1339, 1346 (Fed. Cir. 2010). This principle also means that a petitioner must establish that the vaccinee suffers the injury allegedly linked to the vaccination. *Lombardi v. Sec'y of Health & Hum. Servs.,* 656 F.3d 1343, 1353–54 (Fed. Cir. 2011).

The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *Id.* "[C]lose calls regarding causation are resolved in favor of injured claimants." *Id.* at 1280. Further, evidence used to satisfy one prong of the test may overlap to satisfy another prong. *Capizzano,* 440 F.3d at 1326.

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 548–49. Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge [] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano,* 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, (Fed. Cir. 2019) (citing *Moberly*, 592 F.3d at 1322 and *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde,* 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of her claim. *Lampe v.*

13

*Sec'y of Health & Hum. Servs.*, 219 F.3d 1357,1361 (Fed. Cir. 2000). The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that courts determine the reliability of an expert opinion before it may be considered as evidence. However, in the Vaccine Program, the *Daubert* factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("[U]niquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted."); *see also Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the

> factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors are "meant to be helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The factors do not "constitute 'a definitive checklist or test'" and may be applied differently depending on the facts of a particular case. *Id.* at 150 (quoting *Daubert*, 509 U.S. at 593).

"In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (citation omitted). Thus, for Vaccine Act claims, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 743 (2009) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also D'Tiole v. Sec'y of Health & Hum. Servs.*, No. 15-085V, 2016 WL 7664475, at *24 (Fed. Cl. Spec. Mstr. Nov. 28, 2016) (stating that the Vaccine Act "require[s] a chain of reliable propositions supporting [a] petitioner's theory").

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the

vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.,* 9 F.3d 958, 961 (Fed Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibly raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280.

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008); . Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

Although a temporal association alone is insufficient to establish causation, under the third prong of *Althen*, a petitioner must show that the timing of the injury fits with the causal theory. *See Althen*, 418 F.3d at 1278. The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

A petitioner who satisfies all three prongs of the *Althen* test has established a prima facie showing of causation. *Hammitt v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 719, 726 (2011). A petitioner who demonstrates by a preponderance of the evidence that she suffered an injury caused by vaccination is entitled to compensation unless the respondent can demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to the vaccination. *See Althen*, 418 F.3d at 1278; *Knudsen*, 35 F.3d 543 at 547. In such a case, the government must not merely prove the existence of an alternative cause, but that such an alternative actually caused the injury. *Knudsen,* 35 F.3d at 549. Consequently, when and if the petitioner establishes a prima facie case, the burden then shifts to the government to prove that an alternative cause, unrelated to the administration of the vaccine, was the "sole substantial factor" in causing the alleged injury. *See de Bazan*, 539 F.3d at 1354; *see also Hammitt*, 98 Fed. Cl. at 726 (explaining that the respondent's burden is to show that the "factor unrelated" was the "sole substantial factor" in causing the injury). Additionally, a factor unrelated "may not include 'any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness or condition.'" 42 U.S.C. § 300aa-13(a)(2); *see also Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349 (Fed. Cir. 2010) (stating that an idiopathic diagnosis cannot be a "factor unrelated," as it is idiopathic).

15

## V.        Discussion

### A.  Diagnosis

As Federal Circuit precedent establishes, in certain cases it is appropriate to determine the nature of an injury before engaging in the *Althen* analysis. *See Hibbard v. Sec'y of Health & Hum. Servs.*, 698 F.3d 1358, 1364–65 (Fed. Cir. 2012); *Lombardi*, 656 F.3d at 1353; *Broekelschen*, 618 F.3d at 1346 (finding that in a case where the injury itself is in dispute, it is appropriate for the special master to "first determine which injury was best supported by the evidence presented in the record before applying the *Althen* test so that the special master could subsequently determine causation relative to the injury."). Here, diagnosis is at issue, and so it is appropriate to address first.

Petitioner's expert, Dr. Chen, asserted that Petitioner suffered from ADEM as evidenced by the assessment notes during Petitioner's hospitalization beginning September 30, 2017. A record entered on October 1, 2017, indicates that Petitioner's "overall clinical picture is most consistent with viral encephalitis, and MRI is also suggestive of that." Pet'r's Ex. 4 at 309. Discharge notes stated that the "[l]ikely etiology of [Petitioner's] encephalitis is [ADEM]." *Id.* at 418. Additionally, Petitioner's condition is later referred to as an ADEM episode in subsequent medical records. *See* Pet'r's Ex. 6. While Dr. Roos conceded that Petitioner's records identify her diagnosis as autoimmune encephalitis, she argued that Petitioner's "diagnosis was a diagnosis of exclusion, not a definitive diagnosis." Resp't's Ex. C at 4. Alternatively, Dr. Roos opined that ADEM is typically a children's disease that presents in adults with spinal cord disease (which Petitioner did not have). Dr. Roos did not offer a definitive alternative diagnosis but was critical of decisions by Petitioner's treaters not to definitively rule out other similarly presenting conditions. She concluded that "[t]he differential diagnosis for [Petitioner] to this day includes autoimmune encephalitis, vasculitis or arthropod-borne viral encephalitis. The differential diagnosis does not include [ADEM]." *Id.* at 5.

The Federal Circuit has made clear that "identifying [the Petitioner's] injury is a prerequisite" to the *Althen* analysis. *Broekelschen*, 618 F.3d at 1346. But it is not necessary to diagnose an exact condition. *Astle v. Sec'y of Health & Hum. Servs.*, No. 14-369V, 2018 WL 2682974, at *19 (Fed. Cl. Spec. Mstr. May 15, 2018). In *Lombardi*, the Federal Circuit explained that "[t]he function of a special master is not to diagnose vaccine-related injuries, but instead to determine based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the petitioner's injury." 656 F.3d at 1351 (internal quotation marks omitted) (quoting *Andreu*, 569 F.3d at 1382); *see also Broekelschen*, 618 F.3d at 1346 (citing *Kelley v. Sec'y of Health & Hum. Servs.*, 68 Fed. Cl. 84, 100-01 (2005) for the proposition that "the petitioner [is] not required to categorize his injury where the two possible diagnoses [are] 'variants of the same disorder'"). Furthermore, neither the Vaccine Act nor *Althen* burdens Petitioner with establishing a specific diagnosis. *See Kelley*, 68 Fed. Cl. at 100 ("The Vaccine Act does not require petitioners coming under the non-Table injury provision to categorize their injury; they are merely required to show that the vaccine in question caused them injury—regardless of the ultimate diagnosis"). Indeed, in some cases, it may be impossible to definitively identify the exact condition that Petitioner is suffering from. In the present case, ADEM is listed as Petitioner's diagnosis in multiple records as a contemporaneous

16

diagnosis and later as a part of her medical history. Furthermore, Petitioner's clinical presentation was largely consistent with the medical literature discussing ADEM filed by both parties. I am not qualified to, nor am I mandated with the task of diagnosing Petitioner. I am inclined to afford considerable deference to Petitioner's treaters, despite Dr. Roos' critique of their comprehensiveness. In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen*, 418 F.3d at 1280). Indeed, when reviewing the record, a special master must consider the opinions of treating physicians. *Capizzano*, 440 F.3d at 1326. This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). While a special master must consider these opinions and records, they are not "binding on the special master or court." 42 U.S.C. § 300aa-13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record . . . ." *Id.* Such consideration reveals that Petitioner has presented preponderant evidence that she suffered from ADEM.

## B. Causation Theory

Petitioner asserted the theory of molecular mimicry to explain how the flu vaccine could cause ADEM. In support of this contention, Petitioner identified ADEM as an autoimmune condition that is similar to other CNS and demyelinating diseases that have a medically accepted molecular mimicry pathology. Specifically, she referenced Guillain-Barré Syndrome and transverse myelitis as conditions that are believed in some cases, to have a vaccine-induced etiology. Petitioner also relied on mouse models seeking to explore the relationship between vaccination, multiple sclerosis, and anti-myelin antibody production to illustrate how flu antigen and myelin cross reactivity could be pathogenic. Dr. Chen admitted that the precise mechanism for autoimmunity in ADEM patients remains unknown, however she asserted that "auto-antibodies including anti[-MOG] antibodies ha[ve] been found in patients with ADEM. Pet'r's Ex. 28 at 2.

While Petitioner filed extensive medical literature that discusses the significance of anti-MOG antibodies in patients suffering from other inflammatory demyelinating diseases, she did not provide any rationale for applying a study with a stated purpose of understanding multiple sclerosis pathology, for example, to ADEM. While ADEM and multiple sclerosis present similarly initially, their acute vs chronic natures, respectively, require some discussion on the applicability of one causal mechanism to both conditions. Dr. Chen asserted that the literature filed by Petitioner was preponderant evidence of the causal link between the flu vaccine and ADEM and did more than just identify molecular mimicry. However, despite all of the studies that sought to identify a connection, the literature filed all ultimately concluded without finding evidence of any link. Stojkovic et al. found the "[flu] vaccine has no significant influence on EAE induction and severity of autoimmune processes." Pet'r's Ex. 33 at 5. Also, Li et al. determined that there was no increased risk corresponding with any variant of the flu vaccine. Resp't's Ex. A, Tab 3 at 5. There was no reputable medical or scientific explanation that pertains specifically to a link between the flu vaccine and ADEM. Dr. Chen conceded that she could not identify the relevant homology

17

between a component of the flu vaccine and myelin, but that is not required to meet her burden. Ultimately, Petitioner did not provide preponderant evidence that the flu vaccine can cause ADEM via her asserted causation theory, molecular mimicry. Moreover, she did not submit medical literature and/or an expert opinion that explains the applicability of her asserted analogous vaccine-caused injuries (transverse myelitis, Guillain-Barré Syndrome, or multiple sclerosis) to this case. Therefore, Petitioner has not met her burden under *Althen* prong one.

### C. Actual Causation and Temporal Relationship

Because Petitioner has not presented preponderant evidence of a theory causally linking a flu vaccination to the development of ADEM, she cannot establish actual causation. However, in the interest of completeness and after examining the entire record, I will analyze the evidence of her timing and clinical presentation as compared to the case studies filed and arguments presented by her expert. Petitioner's presentation is inconsistent with the case studies and further illustrates the point that a general causation theory is needed before specific causation can be determined. Petitioner's assertion of vaccine causation fails immediately at symptom onset.

At the time of Petitioner's flu vaccination, she did not report any headache. However, beginning on September 26, 2017, Petitioner's medical records document complaints for "[p]ast [four] days [headache] on top of head and behind eyes constant pressure." Pet'r's Ex. 3 at 28. This would place her headache onset on September 22, 2017. An additional September 22, 2017 medical visit record further provides evidence that Petitioner's headache likely began sometime in the hours following her flu vaccination. Pet'r's Ex. 3 at 38. This chronology is again reconfirmed by documentation of an October 6, 2017 return call from Petitioner's PCP's office to Petitioner's husband explaining her symptom progression.

> [P]atient had flu shot on 9/22, and from that point progressively felt worse. She saw Dr. Doti for headache after that, then on 9/28 patient had [excruciating] pain and husband called ambulance took to Lenox Hill Hosp . . . [following treatment, she was] discharged. Patient woke [two] days later and [her husband] describes she couldn't walk, talk, or see right.

Pet'r's Ex. 3 at 20. Hospitalization records recount the same timeline, detailing a four-day history of headache that varied "in intensity in sharpness and dullness to forehead." Pet'r's Ex. 9 at 38. The diagnosis was noted as "migraine tension headache, reaction to flu, [with a] low suspicion for menningitis (sic). *Id.* Throughout Petitioner's medical records, headache is a symptom that begins on the day of vaccination, gradually worsens over a course of several days and is included in subsequent diagnoses as a relevant symptom. Further, there is no evidence that there was a break in Petitioner's forehead pain from her initial headache on September 22, 2017, to her ER visit with altered mental status on September 30, 2017. *See* Pet'r's Ex. 4 at 252.

Dr. Chen would have me discount Petitioner's initial symptom of headache because it is a common unspecified event that is inconsistent with her asserted causal timeline. However, the medical literature filed by Petitioner and Respondent describes a prodromal phase that is characterized by headache, fever, and malaise. The articles additionally note that severity progresses rapidly during this period as additional symptoms, such as nausea and vomiting, further

18

develop within the next several days to weeks. Two filed case studies of patients who were diagnosed with ADEM following vaccination described similar incubation periods of eight and fifteen days.

Consideration of the all the evidence, including Petitioner's statements to her treaters, medical records, literature, and the expert opinions has revealed preponderant evidence that Petitioner's symptom onset for her ADEM occurred on September 22, 2017, the date of vaccination, with a headache. The Rowhani-Rahbar et al. study outlined the process and timing of ADEM resulting from flu vaccination. Resp't's Ex. A, Tab 5 at 3. They explained that the chain of events ("provision of an antigenic stimulus, the mounting of a subsequent immunologic response, and onset of clinical disease") would require at least 48 hours to be biologically plausible. *Id.* at 4. It is inconsistent with the theory of molecular mimicry to have symptom onset occur the same day as the introduction of the offending antigen (flu vaccine). Accordingly, Petitioner has not met her burden pursuant to *Althen* prong two or three.

## VI.        Conclusion

After a careful review of the record, Petitioner has failed to provide preponderant evidence that her September 22, 2017 flu vaccine, caused her to suffer from ADEM. Accordingly, Petitioner's claim is **DENIED**. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a). [28]

**IT IS SO ORDERED.**

<u>s/Herbrina D. S. Young</u>
Herbrina D. S. Young
Special Master

---

[28] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.